Partial Dissent by Judge CALLAHAN; Dissent by Judge IKUTA
OPINION
GRABER, Circuit Judge:
The Los Angeles Sheriffs Department' (“LASD”) detained Jonathan Castro, in a sobering cell in the West Hollywood police station. Several hours later, authorities placed Jonathan Gonzalez, a combative inmate who had been arrested on a felony charge, in the same cell. Castro banged on the cell’s window to try to. attract attention. Officials at the jail ignored. Castro’s attempts to seek help. The County of Los Angeles and the LASD had not equipped the cell with audio monitoring, and the cell was checked only sporadically. Within hours of their co-confinement, Gonzalez severely beat and injured Castro. Castro sued individual LASD officials, the County of Los Angeles, and the LASD, under 42 U.S.C. § 1983, for violating his due process right as a pretrial detainee to be protected from harm at the hands of other inmates. After a trial, a jury found all Defendants liable. Defendants timely appeal. We affirm.
FACTUAL[1] AND PROCEDURAL HISTORY
Late in the evening of October 2, 2009, two LASD deputies arrested Castro for *1065 public drunkenness, a misdemeanor under California Penal Code section 647(f). Castro, the officers reported, was staggering, bumping into pedestrians, and speaking unintelligibly. The officers arrested Castro for his own safety and transported him to the West Hollywood police station. They placed him in the station’s “sobering cell,” a fully walled chamber that was stripped of objects with hard edges on which an inmate could hurt himself; the cell contained only a toilet and some mattress pads.
Several hours later, authorities arrested Gonzalez on a felony charge after he shattered a glass door with his fist at a nightclub. LASD deputies described Gonzalez as acting “bizarre” at the time of his arrest. The intake form characterized Gonzalez as “combative.” The authorities placed him in the sobering cell with Castro.
The West Hollywood station manual defines a “sobering cell” as a “cell with a padded floor and standard toilet with a padded partition on one side for support. It must allow for maximum visual supervision of prisoners by staff.” The sobering cells are to be used to house inmates who are a threat to their own safety or to others’ safety. The station manual provides that non-eompliant sobering cells “should not be utilized.”
California’s Building Code, adopted through legislative action by the Los An-geles County Board of Supervisors as County law, also includes standards that govern sobering cells. L.A. Cty. Code tit. 26, ch. 1, § 100 (2007). In 2009, the building code required maximum visual supervision of all inmates by staff and provided that inmates requiring more than minimum security must be housed in cells with an inmate or sound-activated audio-monitoring system. Cal. Bldg. Code tit. 24, §§ 1231.2.4, 1231.2.22 (2007). The sobering cell at the West Hollywood police station met neither of those requirements, yet it was used routinely.
Shortly after Gonzalez entered the cell, Castro approached the door and pounded on the window in the door, attempting to attract an officer’s attention.' No one responded. Christopher Solomon, the station’s supervising officer, had assigned an unpaid community volunteer to monitor the cell. The volunteer walked by the cell about 20 minutes after Castro had sought help. He noticed that Castro appeared to be asleep and that Gonzalez was “inappropriately” touching Castro’s thigh, in violation of jail policy. The volunteer did not enter the cell to investigate. Instead, he reported the contact to Solomon. Six minutes later, Solomon arrived at the sobering cell and saw Gonzalez making a violent stomping motion. He opened the door, discovered Gonzalez stomping on Castro’s head, and found Castro lying unconscious in a pool of blood. Solomon separated Gonzalez from Castro and called for medical assistance.
When the paramedics arrived, Castro was unconscious, in respiratory distress, and blue. He was hospitalized for almost a month, after which he was transferred to a ' long-term care facility, where he remained for four years. He suffers from severe memory loss and other cognitive difficulties.
Castro filed a complaint against the County of Los Angeles and the LASD (the “entity defendants”), as well as Solomon and Solomon’s supervisor, David Valentine (the “individual defendants”). He sought to recover actual damages, future damages, punitive damages, and compensation for pain and suffering. Castro claimed that both the entity defendants and the individual defendants violated his constitutional rights by housing him in the sobering cell with Gonzalez and by failing to maintain appropriate supervision of the cell.
The case proceeded to trial. After Castro presented his case, Defendants moved *1066 for judgment as a matter of law on three grounds: (1) insufficient evidence that the design of a jail cell constitutes a policy, practice, or custom by the County that resulted in a constitutional violation; (2) insufficient evidence that a reasonable officer would have known that housing Castro and Gonzalez together was a violation of Castro’s constitutional rights; and (3) insufficient evidence for the jury to award punitive damages. The district court denied the motion. The jury returned a verdict for Castro on all counts and awarded him more than $2 million in damages. Defendants then filed a renewed motion for judgment as a matter of law. The district court denied the renewed motion without issuing a written opinion. Defendants timely appeal.
A three-judge panel affirmed the judgment of the district court as to the individual defendants but reversed as to the entity defendants. Castro v. County of Los Angeles, 797 F.3d 654 (9th Cir. 2015). A majority of active non-recused judges voted to rehear the case en banc. 809 F.3d 536 (9th Cir. 2015).
STANDARD OF REVIEW
We review de novo the district court’s denial of a motion for judgment as a matter of law. Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1005 (9th Cir. 2004). A renewed motion for judgment as a matter of law is properly granted only “if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury’s verdict.” Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir. 2002). “A jury’s verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury’s conclusion, even if it is also possible to draw a contrary conclusion.” Id. In assessing the jury’s verdict, we may not weigh the evidence but simply ask whether the plaintiff has presented sufficient evidence to support the jury’s conclusion. Johnson v. Paradise Valley Unified Sch. Dist., 251 F.3d 1222, 1227-28 (9th Cir. 2001).
DISCUSSION
We address first the claims against the individual defendants and then the claims against the entity defendants.[2]
A. Individual Defendants
The jury found Solomon and Valentine liable for injuries to Castro. Solomon and Valentine maintain that, as a matter of law, they are entitled to qualified immunity and that Castro has failed to show that they were deliberately indifferent to a substantial risk of serious harm.
1. Qualified Immunity
Qualified immunity shields government actors from civil liability under 42 U.S.C. § 1983 if “their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To determine whether an officer is entitled to qualified immunity, a court must evaluate two independent questions: (1) whether the officer’s conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident. *1067 Pearson v. Callahan, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).
Here, Castro — a pretrial detainee who had not been convicted of any crime— had a due process right to be free from violence from other inmates. Fifteen years before Castro’s arrest, in Farmer v. Brennan, 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), the Supreme Court made clear that “prison officials have a duty to protect prisoners from violence at the hands of other prisoners” because corrections officers have “stripped [the inmates] of virtually every means of self-protection and foreclosed their access to outside aid.” (Internal quotation marks and ellipsis omitted.) And the Court had consistently held (before Castro’s arrest) that the due process rights of a pretrial detainee are “at least as great as the Eighth Amendment protections available to a convicted prisoner.” City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983).
The individual defendants acknowledge that the duty to protect Castro from violence was clearly established at the time of the incident. But they argue that such a broad description of that duty is too general to guide our analysis. They also contend that Castro failed to present substantial evidence to establish that they violated their duty to protect him. We disagree with both of those arguments.
First, a right is clearly established when the “contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.” Serrano v. Francis, 345 F.3d 1071, 1077 (9th Cir. 2003) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The “contours” of Castro’s right were his right to be free from violence at the hands of other inmates. Farmer, 511 U.S. at 833, 114 S.Ct. 1970. The Supreme Court need not catalogue every way in which one inmate can harm' another for us to conclude that a reasonable official would understand that his actions violated Castro’s right. Nor do the official’s actions, in this context, require some affirmative act. As we held months before Castro’s arrest, “direct causation by affirmative action is not necessary: ‘a prison official may be held liable under the Eighth Amendment if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.’” Clem v. Lomeli, 566 F.3d 1177, 1182 (9th Cir. 2009) (ellipsis omitted) (quoting Farmer, 511 U.S. at 847, 114 S.Ct. 1970). The contours of the right required only that the individual defendants take reasonable measures to mitigate the substantial risk to Castro. Accordingly, we reject the individual defendants’ argument that the law on which Castro bases his claim was not clearly established, at the time of the incident. Therefore, qualified immunity does not bar the claim against them.
Second, as a factual matter, the jury found that both Solomon and Valentine understood that placing Castro in a cell with a combative inmate, when the cell had no audio or video surveillance and only occasional monitoring, could lead to serious violence against Castro. Substantial evidence supports those findings.
2. Deliberate Indifference[3]
Inmates who sue prison officials for injuries suffered while in custody may do so under the Eighth Amendment’s Cruel and Unusual Punishment Clause or, if *1068 not yet convicted, under the Fourteenth Amendment’s Due Process Clause. See Bell v. Wolfish, 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (holding that, under the Due Process Clause, a detainee may not be punished prior to conviction). Under both clauses, the plaintiff must show that the prison officials acted with “deliberate indifference.”
The standard under the Eighth Amendment to prove deliberate indifference for individual defendants is well established. A prison official cannot be found liable under the Cruel and Unusual Punishment Clause for denying an inmate humane conditions of confinement “unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.” Farmer, 511 U.S. at 837, 114 S.Ct. 1970. “In other words, the official must demonstrate a subjective awareness of the risk of harm.” Conn v. City of Reno, 591 F.3d 1081, 1096 (9th Cir. 2010), cert. granted and judgment vacated, 563 U.S. 915, 131 S.Ct. 1812, 179 L.Ed.2d 769 (2011), opinion reinstated in relevant part, 658 F.3d 897 (9th Cir. 2011).
The standard to find an individual deliberately indifferent under the Fourteenth Amendment, however, is less clear. Our court’s most recent pronouncement on the issue is in Clouthier v. County of Contra Costa, 591 F.3d 1232 (9th Cir. 2010). In Clouthier, parents of a pretrial detainee sued a mental health specialist, sheriffs deputies, and the County of Contra Costa, claiming that the defendants had violated the due process rights of their son by failing to prevent his suicide. Id. at 1236. We read Farmer and Bell to create a single “deliberate indifference” test for plaintiffs who bring a constitutional claim — whether under the Eighth Amendment or the Fourteenth Amendment. We interpreted Bell to require proof of punitive intent for failure-to-protect claims, whether those claims arise in a pretrial or a post-conviction context. Id. We held that,
[i]n light of the Supreme Court’s rulings that conditions of confinement violate pretrial detainees’ Fourteenth Amendment rights if the conditions amount to punishment and that failure to prevent harm amounts to punishment where detention officials are deliberately indifferent, ... the “deliberate indifference” standard applies to claims that correction facility officials failed to address the medical needs of pretrial detainees.
Id. at 1242 (citations omitted). We further held that this standard incorporates the subjective test articulated in Farmer. Id. Under that test, we held that “[a]n official’s failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment,” and so could not support liability under either the Eighth or the Fourteenth Amendment. Id. (quoting Farmer, 511 U.S. at 838, 114 S.Ct. 1970).
The Supreme Court, however, cast that holding into serious doubt in Kingsley v. Hendrickson, — U.S. -, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015). There, the Court considered whether, to prove an excessive force claim, a pretrial detainee must show that the officers were subjectively aware that their use of force was unreasonable, or only that the officers’ use of force was objectively unreasonable. Id. at 2470. To analyze that question with respect to the officers’ use of force, which had included a five-second Taser stun blast to the pretrial detainee’s back, the Supreme Court explained:
In a case like this one, there are, in a sense, two separate state-of-mind questions. The first concerns the defendant’s *1069 state of mind with respect to his physical acts — ie., his state of mind with respect to the bringing about of certain physical consequences in the "world. The second question concerns the defendant’s state of mind with respect to whether his use of force was “excessive.”
Id. at 2472. The Court emphasized that there was “no dispute” as to the first of those questions, because everyone agreed that the officers’ use of force was intentional. Id. It was the second question, on which there was a dispute, that the Court answered. On that second issue, the Court concluded that “the relevant standard is objective not subjective.” Id. Putting it in other words, the Court explained:
In deciding whether the force deliberately used [by the officer on the pretrial detainee] is, constitutionally speaking, “excessive,” should courts use an objective standard only, or instead a subjective standard that takes into account a defendant’s state of mind? It is with respect to this question that we hold that courts must use an objective standard. In short, ... a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable.
Id. at 2472-73.
Under Kingsley, then, it does not matter whether the defendant understood that the force'used was excessive, or intended it to be excessive, because the standard is purely objective. Id. In so holding, the Kings-ley Court expressly rejected the interpretation of Bell on which we had relied in Clouthier. The Court concluded that, “as Bell itself shows (and as our' later precedent affirms), a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose.” Id. at 2473-74 (emphasis added). In sum, Kingsley rejected the notion that there exists a single “deliberate indifference” standard applicable to all § 1983 claims, whether brought by pretrial detainees or by convicted prisoners.
Kingsley did not squarely address whether the objective standard applies to all kinds of claims by pretrial detainees, including both excessive force claims and failure-to-protect claims. An excessive force claim, like the one at issue in Kings-ley, differs in some ways from a failure-to-protect claim, like the one at issue here. An excessive force claim requires an affirmative act; a failure-to-protect claim does not require an affirmative act. And Kings-ley’s holding concerned whether the “force deliberately used is, constitutionally speaking, ‘excessive,’” id. at 2472, which does not necessarily answer the broader question whether the objective standard applies to all § 1983 claims brought under the Fourteenth Amendment against individual defendants.
On the other hand, there are significant reasons to hold that the objective standard applies to failure-to-protect claims as well. “Section 1983 itself ‘contains no state-of-mind requirement independent of that necessary to state a violation’ of the underlying federal right.” Bd. of Cty. Comm’rs v. Brown, 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (quoting Daniels v. Williams, 474 U.S. 327, 330, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)); see also Heffernan v. City of Paterson, — U.S. -, 136 S.Ct. 1412, 1418, 194 L.Ed.2d 508 (2016) (noting that the underlying right in a § 1983 suit tracks the text of the Constitution). The underlying federal right, as well as the nature of the harm suffered, is the same for pretrial detainees’ excessive force and failure-to-protect claims. Both categories of claims arise under the Fourteenth Amendment’s Due Process Clause, rather than under the *1070 Eighth Amendment’s Cruel and Unusual Punishment Clause. “The language of the two Clauses differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less ‘maliciously and sadistically.’ ” Kingsley, 135 S.Ct. at 2475.
We note, too, the broad wording of Kingsley. In rejecting the interpretation of Bell on which we relied in Clouthier, the Court wrote that “a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose.” Kingsley, 135 S.Ct. at 2473-74 (emphasis added). The Court did not limit its holding to “force” but spoke to “the challenged governmental action” generally. We therefore overrule Clouthier to the extent that it identified a single deliberate indifference standard for all § 1983 claims and to the extent that it required a plaintiff to prove an individual defendant’s subjective intent to punish in the context of a pretrial detainee’s failure-to-protect claim.
On balance, we are persuaded that Kingsley applies, as well, to failure-to-protect claims brought by pretrial detainees against individual defendants under the Fourteenth Amendment. Excessive force applied directly by an individual jailer and force applied by a fellow inmate can cause the same injuries, both physical and constitutional. Jailers have a duty to protect pretrial detainees from violence at the hands of other inmates, just as they have a duty to use only appropriate force themselves.
Because of the differences between failure-to-protect claims and claims of excessive force, though, applying Kingsley’s holding to failure-to-protect claims requires further analysis. As explained above, Kingsley recognized that there are two state-of-mind issues at play in an excessive force claim.
The first — the officer’s state of mind with respect to his physical acts — was un-disputedly an intentional one there, because the officer had taken the affirmative act of using force knowingly and purposefully. In the failure-to-protect context, in which the issue is usually inaction rather than action, the equivalent is that the officer’s conduct with respect to the plaintiff was intentional. For example, if the claim relates to housing two individuals together, the inquiry at this step would be whether the placement decision was intentional. Or, if the claim relates to inadequate monitoring of the cell, the inquiry would be whether the officer chose the monitoring practices rather than, for example, having just suffered an accident or sudden illness that rendered him unconscious and thus unable to monitor the cell. As the Supreme Court in Kingsley explained, “if an officer’s Taser goes off by accident or if an officer unintentionally trips and falls on a detainee, causing him harm, the pretrial detainee cannot prevail on an excessive force claim,” because the first state-of-mind factor would not be satisfied. Id. at 2472. Similarly, that factor would not be satisfied in the failure-to-protect context if the officer’s inaction resulted from something totally unintentional.
Under Kingsley, the second question in the failure-to-protect context would then be purely objective: Was there a substantial risk of serious harm to the plaintiff that could have been eliminated through reasonable and available measures that the officer did not take, thus causing the injury that the plaintiff suffered? That inquiry differs from the inquiry with respect to an Eighth Amendment failure-to-protect claim: There, “the deprivation alleged must objectively be sufficiently serious; and the prison official must subjectively *1071 have a sufficiently culpable state of mind.” Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1049 (9th Cir. 2002). As we have explained in the Eighth Amendment context, “[a] prison official cannot be found liable under the Eighth Amendment for denying, an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.” Id. at 1050 (quoting Farmer, 511 U.S. at 837, 114 S.Ct. 1970). Under Kingsley, a pretrial detainee need not prove those subjective elements about the officer’s actual awareness of the level of risk. At the same time, however, the Supreme Court has instructed that “mere lack of due care by a state official” does not “’deprive’ an individual of life, liberty, or property under the Fourteenth Amendment.” Daniels, 474 U.S. at 330-31, 106 S.Ct. 662 (holding that negligent actions or omissions by state officials are not actionable under § 1983); accord Davidson v. Cannon, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) (same). Thus, the test to be applied under Kingsley must require a pretrial detainee who asserts a due process claim for failure to protect to prove more than negligence but less than subjective intent — something akin to reckless disregard.
Putting these principles together, the elements of a pretrial detainee’s Fourteenth Amendment failure-to-protect claim against an individual officer are:
(1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
(2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
(3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved — making the consequences of the defendant’s conduct obvious; and
(4) By not taking such measures, the defendant caused the plaintiffs injuries.[4]
With respect to the third element, the defendant’s conduct must be objectively unreasonable, a test that will necessarily “turn[ ] on the ‘facts and circumstances of each particular case.’” Kingsley, 135 S.Ct. at 2473 (quoting Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)); see also Restatement (Second) of Torts § 500 cmt. a (Am. Law Inst. 2016) (recognizing that “reckless disregard” may be shown by an objective standard under which an individual “is held to the realization of the aggravated risk which a reasonable [person] in his place would have, although he does not himself have it”).
Although the jury instructions in this case differed from the template that we establish today, the jury made findings *1072 that would satisfy this test — or, to the extent that the jury did not, Defendants have waived any challenge to those aspects of the instructions. The district court instructed the jury that Castro’s claim involved Defendants’ deprivation of Castro’s “constitutional right to have reasonable measures taken to guarantee his safety when he was incarcerated at the West Hollywood jail,” that Castro had to prove by a preponderance of the evidence that “the plaintiff faced a substantial risk of serious harm,” that “the defendant was deliberately indifferent to that risk,” and that “the acts, or failure to act, of the defendant caused harm to the plaintiff.” The instructions further recognized that “deliberate indifference” required the defendant to “fail[ ] to take reasonable measures to address [the risk].” By finding in Castro’s favor, the jury necessarily found that Castro had satisfied his burden of proof on all of those points. To the extent that the instructions did not explain that reasonable measures must be available or that the circumstances must have been such that a reasonable officer would have appreciated the risk, the individual defendants have not challenged any of the objective components of the instructions provided to the jury, nor have they argued that any issue should be retried if the subjective element of the test were eliminated in light of Kingsley .[5]
Here, the individual defendants do not claim that there was any miscommunication about the placement of Gonzalez in Castro’s cell or that some other unintentional act created the jail conditions at issue. Nor do the individual defendants dispute that Castro faced a substantial risk of serious harm at the hands of Gonzalez or that they failed to take reasonable measures to mitigate that risk. Rather, the individual defendants argue that there was insufficient evidence to establish their subjective awareness of the danger that Castro faced and their knowing disregard of it, or to establish that their conduct caused Castro’s injuries.
In light of the analysis above, to affirm the jury’s verdict we need only determine that there was substantial evidence that a reasonable officer in the circumstances would have appreciated the high degree of risk involved and that the officers’ failure to take reasonable measures to protect Castro caused his injuries. The jury here found that the officers knew of the substantial risk of serious harm to Castro, which necessarily implies that the jury found that a reasonable officer would have appreciated the risk. Indeed, the jury found that the risk was so obvious, and the individual defendants’ lack of response to it was so blameworthy, that it awarded punitive damages after being instructed as follows:
You may award punitive damages only if you find that the defendant’s conduct that harmed the plaintiff was malicious, oppressive, or in reckless disregard of the plaintiffs rights. Conduct is malicious if it is accompanied by ill will, or spite, or if it is for the purpose of injuring the plaintiff. Conduct is in reckless disregard of the plaintiffs rights if, under the circumstances, it reflects complete indifference to the plaintiffs safety or rights, or if the defendant acts in the face of a perceived risk that his actions will violate the plaintiffs rights under federal law. An act or omission is oppressive if the defendant injures or damages or otherwise violates the rights of the plaintiff with unnecessary harshness or severity, such as by the misuse or abuse of authority or power or by the taking advantage of some weakness or disability or misfortune of the plaintiff.
*1073 There clearly is sufficient evidence to support those findings, as well as the jury’s finding that the officers caused Castro’s injuries by failing to take reasonable measures to address the risk. The individual defendants knew that Castro, who had been detained only for a misdemeanor, was too intoxicated to care for himself; they knew that Gonzalez, a felony arrestee, was enraged and combative; they knew or should have known that the jail’s policies forbade placing the two together in the same cell in those circumstances; and they knew or should have known that other options for placing them in separate cells existed. Moreover, Valentine decided to house Castro in a fully walled sobering cell with a “combative” inmate even though separate cells were typically available and unused. Solomon failed to respond to Castro’s banging on the window in the door of the cell. Jail video of the hallway showed Castro pounding on his cell door for a full minute, while Solomon remained unresponsive, seated at a desk nearby. Solomon failed to respond fast enough to Gonzalez’ inappropriate touching of Castro. Solomon also erred in delegating the safety checks to a volunteer. Valentine failed to supervise Solomon in a way that would have prevented harm to Castro. We have no difficulty concluding that this evidence is sufficient to sustain the jury’s verdict, in Castro’s favor.
B. Entity Defendants
Castro has also sued the County of Los Angeles and the LASD under 42 U.S:C. § 1983. In Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that a municipality may not be held liable for a § 1983 violation under a theory of respondeat superior for the actions of its subordinates. In order to establish municipal liability, a plaintiff must show that a “policy or custom” led to the plaintiffs injury. Id. at 694, 98 S.Ct. 2018. The Court has further required that the plaintiff demonstrate that the policy or custom of a municipality “reflects deliberate indifference to the constitutional rights of its inhabitants.” City of Canton v. Harris, 489 U.S. 378, 392, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).
In this case, the district court instructed the jury as follows with respect to the entity defendants:[6]
In order to prevail on his claim against [the entity defendants], plaintiff must prove each of the following elements by a preponderance of the evidence:
1. the plaintiff was deprived of a constitutional right;
2. the [entity defendants] had a longstanding practice or custom of detaining highly intoxicated people in the West Hollywood jail detoxification cell without constitutionally adequate visual surveillance and audio monitoring;
3. the [entity defendants’] longstanding practice or custom regarding the level of visual surveillance and audio monitoring of the West Hollywood jail detoxification cell was unconstitutional in that it was deliberately indifferent to a substantial risk of serious harm to prisoners in the West Hollywood jail detoxification cell;
*1074 4. the [entity defendants’] longstanding practice or custom caused harm to plaintiff.
Plaintiff must establish an affirmative link between the practice or custom and the particular constitutional violation at issue.
“Practice or custom” means any permanent, widespread, well-settled practice or custom that constitutes a standard operating procedure of the defendant County of Los Angeles.
The court also described the alleged constitutional violation specifically, explaining that Castro’s claim was that the entity defendants “deprived him of his constitutional right to have reasonable measures taken to guarantee his safety when he was incarcerated at the West Hollywood jail.” Finally, the court cautioned:
In evaluating the facts in this case, you must consider the context in which the jails operate. In determining whether defendants violated plaintiffs rights as alleged, you should give deference to jail officials in the adoption and execution of policies and practices that in their judgment are needed to preserve discipline and to maintain internal security. In other words, you must consider whether, in allegedly exposing plaintiff to danger, the defendants were guided by equally important considerations. The existence of arguably superior alternatives to the design, operation, and conditions in place in a jail does not necessarily give rise to constitutional liability.
The entity defendants contest the verdict against them on several grounds: that the instructions were erroneous because they spelled out what custom or practice Castro alleged; that the design of a jail cell is not a policy, custom, or practice; and that the evidence failed to show either causation or deliberate indifference.[7] We are not persuaded. Grouping those challenges somewhat differently, we will address, first, whether the instructions were adequate; second, whether the entity defendants had a policy or custom that caused Castro’s injury;, and, third, whether the policy or custom reflected deliberate indifference on the part of the municipality-
1. Jury Instructions
We review the formulation of jury instructions for abuse of discretion in a civil case, considering the instructions as a whole. Guebara v. Allstate Ins. Co., 237 F.3d 987, 992 (9th Cir. 2001). Under that standard, we see no error. The instructions properly identified the elements of Castro’s claim against the entity defendants. The district court’s decision to focus the jury’s attention on the particular custom or practice alleged was neither misleading nor inadequate. See id. (stating that the appellate court determines whether the instructions, considered as a whole, are misleading or inadequate). To the contrary, the instruction clarified precisely what the jury was called on to decide.
*1075 2. Policy or Custom Causing Injury
The “first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.” City of Canton, 489 U.S. at 385, 109 S.Ct. 1197. The custom or policy must be a “deliberate choice to follow a course of action ... made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.” Pembaur v. City of Cincinnati, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion).
As noted, the entity defendants argue that the architecture of the West Hollywood police station’s sobering cell cannot be a policy, custom, or'practice. We need not decide that question, because the design of the cell is not the custom or practice alleged by the plaintiff and, found by the jury. Whether or not the design of the cell is a policy, custom, or practice, it is a fact; the sobering cell lacked audio monitoring and video surveillance.[8]
That is, the design of the cell is only the backdrop for the entity defendants’ policy or custom, as described in the jury instructions and as reflected in the record. The LASD and the County made deliberate choices in light of the poor design and location of the sobering cell. There was a custom of housing intoxicated inmates in sobering cells that contained inadequate audio monitoring. A representative of the County admitted that other options existed; there were other cells in which to detain intoxicated prisoners. The entities chose a policy to check on inmates only every 30 minutes. A representative of the County testified that supervision of the sobering cell consisted of “half-hour checks by the jailer.” These routine practices were consciously designed and, together, they amount to a custom or policy.[9] The custom or policy, in summary, was to use a sobering cell that lacked adequate audio surveillance to detain more than one belligerent drunk person while checking the cell visually only once every half hour.
The entity defendants’ custom or policy caused Castro’s injury. Had the entity defendants provided consistent monitoring, or had the entity defendants required Castro and his attacker to be housed in different locations, which were available,[10] Gon *1076 zalez’ attack on Castro could have been averted. The stated purpose of the sobering cell is the housing of prisoners who are a threat to their own safety. But the absence of frequent visual checks and the lack of audio monitoring clearly made the risk of serious harm to such prisoners substantial. The jury found that LASD’s and the County’s custom or practice caused Castro’s injury. Substantial evidence supports the jury’s findings.
3. Deliberate Indifference
It is not sufficient for a plaintiff to identify a custom or policy, attributable to the municipality, that caused his injury. A plaintiff must also demonstrate that the custom or policy was adhered to with “deliberate indifference to the constitutional rights of [the jail’s] inhabitants.” City of Canton, 489 U.S. at 392, 109 S.Ct. 1197.
The Supreme Court has strongly suggested that the deliberate indifference standard for municipalities is always an objective inquiry. In City of Canton, which concerned a Fourteenth Amendment claim for failure to train, the Court held that a municipality was deliberately indifferent when “the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.” Id. at 390, 109 S.Ct. 1197. The Court articulated a standard permitting liability on a showing of notice: “Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of Monell are satisfied.” Id. at 396, 109 S.Ct. 1197 (emphasis added).
In Farmer, the Court clarified its earlier holding: “[I]t would be hard to describe the Canton understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice, as anything but objective.” Farmer, 511 U.S. at 841, 114 S.Ct. 1970. The Court understood that this objective standard necessarily applied to municipalities for the practical reason that government entities, unlike individuals, do not themselves have states of mind: “Needless to say, moreover, considerable conceptual difficulty would attend any search for the subjective state of mind of a governmental entity, as distinct from that of a governmental official.” Id. We, too, have recognized that an objective standard applies. Gibson v. County of Washoe, 290 F.3d 1175, 1195 (9th Cir. 2002). To the extent that Gibson or our other cases suggest otherwise, we now overrule those holdings.
Here, substantial evidence supported the jury’s finding that the County knew that its cell design might lead to a constitutional violation among its inhabitants. At the time of the attack in this case, the Los Angeles County Code “adopted by *1077 reference and incorporated into ... the Los Angeles County Code as if fully set forth below” chapters of the California Building Code.[11] L.A. Cty. Code tit. 26, ch. I, § 100 (2007). In turn, the California Building Code requires “an inmate- or sound-actuated audio monitoring system in ... sobering cells ... which is capable of alerting personnel who can respond immediately.” Cal. Bldg. Code tit. 24 § 1231.2.22 (2007). Furthermore, the West Hollywood police station’s own manual mandates that a sobering cell “allow for maximum visual, supervision of prisoners by staff.” The station manual forbids the use of non-compliant sobering cells.
Judge Callahan’s dissent makes much of the fact that the California Building Code contains a “grandfather” clause. Callahan, J., dissenting at 38. But the dissent overlooks that the West Hollywood manual contains no such “grandfather” clause. To the contrary, that manual expressly refers to current building standards and expressly declines to permit the use of older cells simply by virtue of their having been previously compliant:
A sobering cell is generally defined as a cell with a padded floor and standard toilet with a padded partition on one side for support. It must allow for maximum visual supervision of prisoners by staff. For specific construction specifications refer to Uniform Building Code, Title 24, Section 13-102(c)2 and 13-102(c)3.
Most station sobering cells (built prior to current State standards) have a hard floor, standard toilet, wash basin, drinking fountain, and a solid raised ledge or bench. Unless otherwise exempted by the State Board of Corrections, these sobering cells are out of compliance with current standards and should not be utilized.
The West Hollywood sobering cell was non-compliant in at least two respects, in that it lacked all the required padding and, more importantly for our purposes, did not “allow for maximum visual supervision of prisoners by staff.”
The County Board of Supervisors’ affirmative adoption of regulations aimed at mitigating the risk of serious injury to individuals housed in sobering cells, and a statement to the same effect in the station’s manual, conclusively prove that the County knew of the risk of the very type of harm that befell Castro. See Brown, 520 U.S. at 405-06, 117 S.Ct. 1382 (describing Owen v. City of Independence, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), and City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), as municipal liability cases involving “no difficult questions, of fault” because they involved “formal decisions of municipal legislative bodies”). The adoption of a regulation by the County’s legislative body suffices as proof of notice because the County necessarily has knowledge of its own ordinances. We have said that “a municipality’s policies [that] explicitly acknowledge that substantial risks of serious harm exist” may demonstrate municipal knowledge of that risk for the purposes of a Fourteenth Amendment failure-to-protect claim. Gibson, 290 F.3d at 1188 n.10. Here, the ordinance adopted by the County is a policy that explicitly acknowledges the relevant substantial risks of serious harm.
*1078 Accordingly, the entity defendants had notice that their customs or policies posed a substantial risk of serious harm to persons detained in the West Hollywood sobering cell and were deliberately indifferent to that risk. Therefore, we affirm the judgment against the entity defendants.
AFFIRMED.

. We must construe the facts in the light most favorable to the jury's verdict. Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir. 2002).

. We incorporate by reference the three-judge panel's opinion as to punitive damages, contained in section II.C., Castro, 797 F.3d at 669-70, and as to future medical expenses, contained in section II.E., id. at 675-76. And we reject the County's claim that the Eleventh Amendment bars this suit. See Jackson v. Barnes, 749 F.3d 755, 764-65 (9th Cir. 2014) (holding that a sheriff's department is a county actor when supervising a jail); Streit v. County of Los Angeles, 236 F.3d 552, 566-67 (9th Cir. 2001) (same).

. Judge Watford joins the majority opinion with the exception of section A.2 of the Discussion.

. Judge Ikuta, in dissent, suggests that this new test would be "underinclusive.” She claims that it could relieve some officials of liability despite their deliberate indifference because a jury might not find intent where a defendant failed to act. Ikuta, J., dissenting at 52. But the state-of-mind requirement articulated here is less stringent than the subjective test that preceded it. In a failure-to-protect case where a defendant actually knew of a substantial risk of serious harm and consciously took no action, one would expect a jury to find that the defendant made an intentional decision. Contrary to Judge Ikuta's view, the result in Lolli v. County of Orange, 351 F.3d 410 (9th Cir. 2003), would be the same under our test. Lolli held only that summary judgment for some of the defendants was improper because factual issues remained for the jury. Id. at 419-21. And the four required factors prevent "overinclusiveness'' by ensuring that liability will attach only in cases whére the defendant's conduct is more egregious than mere negligence.

. In response to orders from this court, the parties filed two rounds of supplemental briefing specifically addressing the question of how Kingsley affects this case.

. The court did not define "deliberately indifferent” in the instruction concerning the entity defendants, but the entity defendants do not assign error to that omission. In an earlier instruction concerning the individual defendants, the court defined "deliberately indifferent” to mean that "the defendant knew of the risk and disregarded it by failing to take reasonable measures to address it. Merely being negligent, or failing to alleviate a significant risk that the defendant should have perceived but didn’t, does not constitute 'deliberate indifference.’ ”

. The entity defendants also argue that a plaintiff can establish neither a custom or practice, nor deliberate indifference, without ■ proving prior incidents of harm. The entity defendants failed to preserve that argument in the district court. See Whittaker Corp. v. Execuair Corp., 953 F.2d 510, 515 (9th Cir. 1992) (holding that an appeals court will generally not consider an argument raised for the first time on appeal). Indeed, they argued the very • opposite. At trial, Defendants vigorously opposed the introduction of Castro’s anticipated "evidence of prior or subsequent assaults on other inmates,” on the ground that "such evidence is irrelevant and unduly prejudicial.” Even if not waived or forfeited, the argument is legally inaccurate. See Brown, 520 U.S. at 409, 117 S.Ct. 1382 (noting that evidence of a single violation of federal rights can, in some circumstances, trigger municipal liability).

. We note, though, that every construction project requires deliberate choices in design and implementation. The West Hollywood station is no exception. For example, the County admitted that it chose not to install a video camera that records what happens inside the cell, because it wanted to protect the privacy of detainees.

. Judge Callahan’s dissent takes issue with formulating a "custom or practice” that has more than one component. Callahan, J., dissenting at 41-43. The entity defendants have not made that argument and, therefore, have forfeited or waived it. See Greenwood v. Fed. Aviation Admin., 28 F.3d 971, 977 (9th Cir. 1994) (holding that generally we will not consider issues not presented in an appellant's opening brief). Moreover, a "custom or practice” need not be narrowly unitary in this context. We have found no case holding that a "policy” must be one-dimensional. To the contrary, many cases describe multi-faceted policies, which are not rejected for that reason. See, e.g., Garcia v. County of Riverside, 817 F.3d 635, 638, 642 (9th Cir. 2016) (describing the relevant policy of the Los Angeles Sheriff's Department as having several components).

.Judge Callahan's dissent also appears to argue that there cannot be a deliberately chosen custom or practice of housing a belligerent detainee in the same sobering cell as another detainee because a written policy prohibited it. Callahan, J., dissenting at 43 n.5. But a plaintiff can show a custom or practice of violating a written policy; otherwise an entity, no matter how flagrant its actual routine practices, always could avoid *1076 liability by pointing to a pristine set of policies. See City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion) (holding that "egregious attempts by local governments to insulate themselves from liability for unconstitutional policies are precluded" and "a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law” (internal quotation marks omitted)). Here, for example, there was testimony that "two or more belligerent drunk individuals” were housed in "this detox cell” "[m]any times." Taking the facts in the light most favorable to the prevailing party, as our standard of review requires, we conclude that the jury permissibly found that such testimony established a policy of deliberate indifference.

. Even though the County Code provision was not in evidence in the district court, we may take judicial notice of it because it is “not subject to reasonable dispute” and “can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.” Fed. R. Evid. 201(b)(2); see also Santa Monica Food Not Bombs v. City of Santa Monica, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006) (holding that local ordinances are proper subjects for judicial notice).