NOT FOR PUBLICATION

**FILED**

UNITED STATES COURT OF APPEALS

MAR 7 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

GARY SALZMAN, individually; MARY
SALZMAN, individually; CHLOE
BROCKWAY, individually and as Personal
Representative of the Estate of Gary Salzman
Jr., deceased; T.J., by and through Guardian
Ad Litem, Jennifer Jones,

              Plaintiffs-Appellants,

  v.

COUNTY OF LOS ANGELES, a
Governmental Entity; SHOHREH
GHAEMIAN, individually; ERIKA UBOM,
Individually; AYALA, individually;
TAELYR PATTON, individually; MARIA
CARMICHAEL, individually; SKERRETT,
individually; CASTRO; ARANDA,
individually; ROSE, individually,

              Defendants-Appellees.

No.   22-56088

D.C. No.
2:22-cv-00094-PA-SK

MEMORANDUM[*]

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted February 6, 2024
Pasadena, California

Before: WARDLAW, FRIEDLAND, and SUNG, Circuit Judges.

---

[*]      This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

Gary Salzman, Mary Salzman, Chloe Brockway, and "T.J." ("Appellants") appeal the district court's grant of summary judgment to the County of Los Angeles ("County") and individual defendants Maria Carmichael, Shohreh Ghaemian, Taelyr Patton, Jose Ayala, Raul Castro, Daniel Rose, Carlton Skerrett, Erika Ubom, and Benjamin Aranda in this 42 U.S.C. § 1983 action. Appellants alleged deliberate indifference to a substantial risk of harm to health and safety, supervisorial liability, liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and state law claims arising out of the death of pretrial detainee Gary Salzman, Jr. ("Salzman"). We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

Following a prior arrest and referral to a psychiatric hospital under California Welfare & Institutional Code § 5150, Salzman was arrested for robbery on June 22, 2020, and was again booked into the Los Angeles County Twin Towers Correctional Facility ("TTCF"). During the intake process, custody staff observed that Salzman exhibited rapid mood changes and falsely insisted that he was a "5-star general." Erika Ubom, a registered nurse, referred him for a medical and expedited mental health assessment. Maria Carmichael, a licensed clinical social worker, evaluated Salzman and recommended his transfer to a temporary solo cell in High Observation Housing ("HOH"), where he would receive a reassessment by a mental health professional within 24 hours. Dr. Shohreh

2

Ghaemian, a psychiatrist, evaluated Salzman and concluded that he was grandiose and psychotic. Salzman told Dr. Ghaemian that he suffered from post-traumatic stress disorder and bipolar disorder. Dr. Ghaemian ordered medication and recommended dual housing in the HOH unit. Meanwhile, Miguel Escobar, who also suffered from mental health issues, was arrested, evaluated, and also recommended for cohabitation in a HOH cell. Non-defendant staff members housed Salzman with Escobar, who in an approximately fifteen-minute attack on July 5, 2020, killed Salzman in their shared cell.

1. The district court properly granted summary judgment in favor of the individual defendant deputies and medical staff members on Appellants' deliberate indifference claims. To establish a 14th Amendment claim of deliberate indifference to a substantial risk of harm to health and safety, Appellants must demonstrate: (1) the "defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;" (2) "[t]hose conditions put the plaintiff at substantial risk of suffering serious harm;" (3) "[t]he defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious;" and (4) "[b]y not taking such measures, the defendant caused the plaintiff's injuries." *Castro v. Cnty of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc). We

consider the actions and omissions of each defendant in turn. *See Leer v. Murphy*, 844 F.2d 628, 633–34 (9th Cir. 1988).

a. Maria Carmichael conducted Salzman's initial mental health evaluation. Finding Salzman "hostile, agitated, uncooperative, [and] delusional," Carmichael was unable to complete a full suicide risk evaluation and defaulted to deeming him at medium risk of suicide. Carmichael assigned Salzman a P3[1] rating and recommended single-man HOH, which guaranteed another mental health assessment within 24 hours. Carmichael had no further contact with Salzman or role in his care. Appellants argue on appeal that Carmichael should have given Salzman a P4 rating and placed him on a California Welfare & Institutions Code § 5150 hold. However, in their Separate Statement of Disputed and Additional Undisputed Facts in support of their Opposition to Summary Judgment ("Separate Statement"), Appellants did not dispute that Carmichael acted appropriately in

---

[1] The County assesses inmates using a "P rating system," with ratings ranging from P0 to P4. Inmates with a P3 rating have several mental health issues and require safety checks every 15 minutes, must wear safety gowns, and have limited access to certain parts of jail property. P3 inmates in HOH are often placed in cells with another person to reduce isolation-related symptoms and the risk of suicide. A P4 designation is reserved for the most at-risk inmates who meet the requirements for a California Welfare & Institutions Code § 5150 hold, meaning that they are "gravely disabled" and a danger to themselves or others. Inmates with a P4 designation also generally refuse to take medication, exhibit self-injurious behaviors, are actively assaultive, have poor or no self-hygiene to the point where it poses a health risk, and cannot or will not engage in any form of communication or treatment.

4

evaluating Salzman. Moreover, the County's expert, licensed clinical psychologist Dr. Karen Siscoe, agreed in unrefuted testimony that Carmichael "appropriately made Salzman a P3 and recommended that he transfer to [HOH]." Appellants now argue that Carmichael should have "followed up aggressively" to ensure that Salzman was placed in a single-detainee cell, but Appellants have provided no evidence that Carmichael had the "dut[y], discretion, and means" to monitor any subsequent mental health assessment or to change a subsequent psychiatrist's recommendation. *See Leer*, 844 F.2d at 633. Therefore, Carmichael did not fail to take "reasonable available measures to abate" a risk of harm to Salzman. *Gordon v. Cnty of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) (citing *Castro*, 833 F.3d at 1071).

b. Dr. Shohreh Ghaemian, a psychiatrist who conducted the next evaluation on June 25, 2020, concluded that Salzman did not meet the criteria for a P4 designation or a referral to Forensic In-Patient ("FIP") care, a form of involuntary inpatient psychiatric hospitalization. Although Appellants argue on appeal that Dr. Ghaemian's recommendation was "medically unacceptable," in their Separate Statement, Appellants did not dispute that Dr. Ghaemian acted appropriately. Moreover, by the time Dr. Ghaemian evaluated him, Salzman was "no longer hostile or aggressive," but was "cooperative." Nor was Salzman homicidal, suicidal, or hallucinatory. Therefore, cohabitation was not only possible, but

5

preferable, according to Dr. Ghaemian's clinical judgment, Dr. Siscoe's uncontroverted testimony, and HOH policy. Dr. Ghaemian's clinical judgment was accordingly not "so inadequate to the circumstances known to the medical staff as to amount to deliberate indifference." *Russell v. Lumitap*, 31 F.4th 729, 741 (9th Cir. 2022). Dr. Ghaemian had no further contact with Salzman.

c. On June 30, 2020, Taelyr Patton, a psychiatric social worker, interviewed Salzman and Escobar through their cell door. Patton documented on their charts that Salzman and Escobar were compliant with their medications and recommended that they continue with their mental health treatment in HOH, where they would be reevaluated within seven days. Appellants argue that Patton should have separated Salzman and Escobar in light of their history of mental health issues, their "unusual co-dependent tendencies," and Carmichael's earlier recommendation of single housing for Salzman. But Patton observed that Salzman was "positively engaging with [his] cellmate," and she did not observe any evidence that the cellmates were not getting along. Under these circumstances, Patton did not ignore a "substantial risk" of serious harm to Salzman that "a reasonable official in the circumstances would have appreciated." *Gordon*, 888 F.3d at 1125.

d. Appellants contend that deputies Daniel Rose, Raul Castro, and Jose Ayala, who were on duty and responded on the day of the attack, knew or should

have known that Salzman was at substantial risk of harm by Escobar. Deputy Rose had not previously been assigned to the module housing Salzman and Escobar but had been assigned to a neighboring module, from which he responded to the call for assistance once the attack was discovered. Deputy Castro's first day assigned to Salzman and Escobar's housing module was the day of the attack. Only Deputy Ayala had worked on Salzman and Escobar's housing unit in the days before the attack.

An inmate housed in an adjacent cell, Rogelio Nava, testified that in the days before the attack, he heard banging noises, and statements including "I'm a five-star general" and "I'm trained to kill." He also testified that he tried to inform the deputies that he could not sleep or meditate because of the noise, but they ignored him. However, the record is devoid of evidence that the individual deputy defendants named were the ones that heard and ignored Nava's statements, *Leer*, 844 F.2d at 633–34, or that they were otherwise aware of the noise and threats, *see Hyde v. City of Willcox*, 23 F.4th 863, 873 (9th Cir. 2022).

Appellants also assert that Ayala, Castro, and Rose "made an intentional decision to not monitor a live videostream" of Salzman's cell. However, there is no evidence that it was a part of the deputies' duties to monitor a live feed of the video, and it is undisputed that they performed the required safety checks every fifteen minutes. *See Leer*, 844 F.2d at 633–34. The video footage itself shows no

7

evidence that the deputies, including Ayala who used the stairs adjacent to the cell 12 minutes into the attack, knew or should have known of the ongoing attack. Moreover, Castro intervened in the attack only 33 seconds after Ayala was on the stairs. Dr. Gary Vilke established that "[h]ad the deputies started chest compressions a minute or two earlier, there would be no measurable difference in the ultimate outcome." Further, Dr. Kenji Inaba established that Salzman experienced "a full cardiac arrest due to blunt force trauma," which was not survivable "once he went into cardiac arrest no matter what type of medical treatment he obtained or the timing of any such treatment." *See Castro*, 833 F.3d at 1071. And Appellants have not provided any evidence of their own to create a dispute of material fact as to whether intervening 33 seconds earlier would have prevented Salzman's death.[2]

2. Because Appellants fail to show that Ayala, Castro, or Rose violated Salzman's constitutional rights, the district court properly granted summary judgment to their supervisor, Sergeant Carlton Skerrett, on Appellants' supervisorial liability claim. *See Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001).[3]

---

[2] Appellants failed to argue in their opening brief that summary judgment was improperly granted to Erika Ubom or Benjamin Aranda and have thus forfeited that challenge. *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999).
[3] Because Appellants fail to show that the defendants violated Salzman's constitutional rights, we need not reach the issue of qualified immunity or

8

**AFFIRMED.**

---

Appellants' state law claims. *See Jackson*, 268 F.3d at 653; 28 U.S.C. § 1367(c)(3). We also need not reach Appellants' *Monell* claims, because Appellants do not challenge on appeal the district court's conclusion that their *Monell* claims fail if no individual defendant violated Salzman's constitutional rights. *See Hernandez v. Garland*, 47 F.4th 908, 916 (9th Cir. 2022) (explaining that issues not "specifically and distinctly" argued in an opening brief are forfeited). *But cf. Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 604 (9th Cir. 2019) (explaining that, under our case law, municipal *Monell* liability may be possible "even in situations in which no individual officer is held liable for violating a plaintiff's constitutional rights").